# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **Karl Fugate,** | : | |
| | : | **Case No. 1:19-cv-00030** |
| **Plaintiff,** | : | |
| | : | **Judge Matthew McFarland** |
| **v.** | : | |
| | : | |
| **Ronald Erdos,** | : | |
| | : | **Magistrate Judge Bowman** |
| **Defendants, et.al.** | : | |

---

## DEFENDANT ERDOS' OPPOSITION TO SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

Now comes defendant, Ronald Erdos, and opposes Plaintiff Karl Fugate's Motion for Summary Judgment, and in the alternative, moves this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in his favor on the Fourth and Eighth Amendment claims against him. The grounds for this opposition and motion are set forth more fully in the attached memorandum.

Respectfully submitted,
DAVE YOST
Ohio Attorney General

/s/ *Thomas E. Madden*
THOMAS E. MADDEN (0077069)
*Lead Trial Attorney*
Senior Assistant Attorney General
Criminal Justice Section
150 East Gay Street – 16th Floor
Columbus, Ohio 43215
Tel:  (614) 644-7233
Fax:  (866) 239-5489
Thomas.madden@ohioattorneygeneral.gov

*Counsel for Defendant*

## MEMORANDUM IN SUPPORT

### I.      INTRODUCTION

Not only should this Court deny Inmate Fugate's request for summary judgment, but rather, based on the undisputed evidence attached, this Court should grant summary judgment in favor of Defendant Erdos.  Defendant Ronald Erdos is the warden at the Southern Ohio Correctional Facility ("SOCF"), a maximum security facility, that houses many of Ohio's most dangerous inmates. Plaintiff Fugate is one of those dangerous inmates, and was housed at SOCF at the time of the events giving rise to this case. At SOCF, Plaintiff admittedly attacked a hearing officer during an administrative hearing where his security status was being reviewed for recent assault of another inmate. Plaintiff managed to strike the hearing officer, cutting his left cheek, and a weapon was found at the scene of the incident. His appalling motive was to obtain a transfer to Ohio State Penitentiary ("OSP"). He was taken to J1 at SOCF, and placed in double-door cell. Concerned for the safety of both inmates and staff, due to Plaintiff's aggressive behavior, Defendant Erdos reasonably ordered that Plaintiff's cell be searched, and that he be strip-searched every day during each of SOCF staffs' three shifts for weapons and contraband. This order was carried out for thirty days following Plaintiff's RIB hearing based on Warden Erdos' legitimate belief that Plaintiff may attack yet another person in a drastic attempt to obtain the transfer to OSP he so desperately sought. Defendant Erdos' concerns were not malicious, but rather were based on legitimate security concerns, and clearly outweighed Plaintiff's limited privacy rights. Thus, Defendant Erdos is entitled to summary judgment.

### II.     PROCEDURAL HISTORY

1.   INMATE FUGATE'S COMPLAINT ALLEGATIONS

Plaintiff, Karl Fugate, is an inmate in the custody of the Ohio Department of Rehabilitation and Correction. ("ODRC"). He filed a complaint on February 14, 2019 pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated by Defendant Erdos and five other ODRC employees. Plaintiff admits he assaulted "unit staff," which led to the events giving rise to this case. (Doc. 1, Complaint, PageId# 16.) Per Plaintiff, for the next thirty (30) days following his assault on a staff member, he was taken out of his cell, taken to the shower, and stripped searched. (*Id*., PageId# 47.) His cell was then searched. (*Id*.) He was told by staff that Warden Erdos had issued an order that this be done. (*Id*.) According to Plaintiff, he was searched every shift, roughly ninety (90) times, in thirty (30) days. (*Id*.) Plaintiff claims these searches were conducted for "punitive action." (*Id*.) Plaintiff seeks injunctive relief preventing him from being sent back to SOFC. (*Id*, PageId# 49.) He also seeks fifty thousand dollars for the excessive strip searches. (*Id*, PageId# 50.)

After reviewing the Complaint in its initial screening pursuant to the Prison Litigation Reform Act ("PLRA"), this Court dismissed Plaintiff's claims with prejudice, except for the excessive force claim under the Eighth Amendment against Defendants Fri, McCoy, Felts, and Eshem, and the claim under the Fourth and Eighth Amendment against Warden Erdos for ordering the strip-searches. (Doc. 4, Order, PageId# 64.). Plaintiff filed a motion for summary judgment on June 4, 2020. (Doc. 54). Defendant Erdos now opposes Plaintiff's motion and submits a cross-motion for summary judgment in his favor.

2.  THE FACTS

On January 17, 2017, Plaintiff was housed at SOCF. Due to his recent assault on another inmate, Plaintiff Fugate was in the Rules Infraction Board ("RIB") area of J Block on that day for a classification review before Hearing Officer Anderson and Correction Specialist Nolan. (Nolan,

¶ 3.)  Fugate was handcuffed when he entered the hearing room. (Ex. B, Video, 026-17c, 11:24.18.) At the hearing, Hearing Officer Michael Anderson advised Plaintiff that his security status was not being raised to level 5, but rather, he was to remain a level 4B. (Ex. I, Nolan dec., ¶3.)  Plaintiff asked if he was being referred to 5B, Plaintiff responded "that's wrong, I should be going to 5B." (Ex. I, Nolan, ¶ 3; Ex. H, McCoy dec.,¶ 3.)  When asked if he wanted to make a statement, Plaintiff said "No." (Ex. I, Nolan ¶ 3.)  When asked if he would sign his paperwork, Plaintiff refused. (*Id*.) Mr. Anderson advised Plaintiff that he could go back to his cell. (*Id*.)  Officer McCoy directed Plaintiff by stating "lets go." (Ex. H, McCoy, ¶ 3.) As Mr. Anderson was writing refused to sign, Plaintiff lunged across the desk and struck Anderson in the face (left cheek). (Ex. I, Nolan, ¶4; Ex. H, McCoy, ¶ 4; Ex. B, Video 026-17c, 11:24:51.)[1]  Corrections Officers Fri and McCoy grabbed Plaintiff and eventually subdued him. (Ex. I, Nolan, ¶5; Ex. H, McCoy, ¶5.) Anderson suffered a laceration on his left cheek from the attack. (*Id*., ¶ 9.) Fugate was eventually escorted to J1. (Ex. E, Erdos, ¶5.) According Fugate, "I had already had it planned in my mind that the next time I [saw Anderson] and I didn't have cuffs on I was going to assault him… and, that's what I did. Assault him." (Fugate, depo., p. 7.)  Fugate does not deny that he assaulted Anderson. (*Id*.)

Officer Cooper responded to the incident after it was over, and noticed Anderson's cut on his face. (Ex. M, Cooper dec. ¶3.)  Later, Officer Cooper was asked to search for any weapons at the scene of the incident, which was in disarray given the struggle, and found a flattened piece of a battery case. (*Id*, ¶ 3,4.)  The battery case was sharpened to an edge. (*Id*., ¶4.)  The battery case was located in the center of the desk. (*Id*.) Cooper confiscated the weapon. (*Id*.)

Shortly thereafter, Warden Erdos was informed that Fugate assaulted Anderson, and a weapon was found— the flattened piece of a battery case. (Ex. E, Erdos, ¶3; Ex. M, Cooper, ¶4.) Erdos

---

[1] The video comes from a video camera located in the hallway outside the hearing room, and you can only see what takes place in the hearing room from the door. Video 026.17c.)

was also informed that Fugate was at the hearing because he recently assaulted another inmate. (Ex. E, Erdos, ¶5.) Defendant Erdos was advised that Fugate was upset because Anderson had refused to increase his security status, which would have resulted in his transfer to OSP. (*Id*.)

Inmates who are deemed most dangerous at SOCF are housed in the J1 area. (Ex. E, Erdos, ¶6.) Because Fugate was housed in J1, under post-orders, he was subject to unplanned cell searches by staff. (*Id*.) Under post-orders at the time, every inmate housed in slammer cells (cell 11-15), or the double cell (cell 5), had to be searched every day during first and second shift. (Ex. E, Erdos, ¶7.) These cells are reserved for inmates determined to be the most dangerous to staff and other inmates. (*Id*.)

At J1, guards conduct these searches in the following manner: First they open the gate to the corridor outside the cells, and walk to the cell of the inmate intended to be searched. The guard then orders the inmate to cuff-up, where the inmate turns his back to the cuff-port and allows himself to be cuffed. After cuffing the inmate, the guard then leaves the corridor, through the gate, which is then shut, and the cell door is electronically opened. The inmate is then ordered to the shower, where he was secured, and then strip searched. The guard then walks to the opened cell where he conducts a search of the cell. After the cell is searched, the guard leaves the corridor, and the inmate (handcuffed) is allowed to walk back to his cell from the shower, where the cell door is closed. The guard then walks to the front of the cell, and takes off the restraints from the cuff-port in the door. (Ex. E, Erdos, ¶8.)

Due to security concerns, Warden Erdos ordered Captain Whitman to have Fugate searched every shift. Given that Fugate had recently attacked an inmate and a member of staff in an effort to obtain a transfer to OSP, Warden Erdos believed Fugate to be particularly dangerous. (Ex. E, Erdos, ¶9 & 10.)  Because guards conduct their searches of inmates early in their shift, Warden

Erdos was concerned Fugate might be smuggled a weapon by an inmate porter near the end of second shift. (Ex. E, Erdos, ¶10.) Thus, Warden Erdos ordered Fugate to also be searched on third shift. (*Id*.) Based on concerns over Fugate's propensity for violence, Fugate was strip-searched, and his cell was searched every shift for thirty days. (Ex. E, Erdos, ¶11.) Eventually, Fugate was transferred to OSP. (Ex. E, Erdos, ¶12.)

III.   **INMATE FUGATE FAILS TO MEET THE REQUIREMENTS TO SUCCEED ON A MOTION FOR SUMMARY JUDGMENT**

1.   STANDARD.

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. A party asserting that a fact cannot be genuinely disputed must support the assertion by citing to materials in the record, including depositions, documents, affidavits or declarations, stipulations, admissions, or interrogatory answers, etc. *See* Fed. R. Civ. P. 56(c). Summary judgment will not lie if there is a genuine dispute about material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is 'genuine' when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dearing v. Mahlman,* No. 1:11-cv-204, 2013 U.S. Dist. LEXIS 188064, * 8 (S.D. Ohio Oct. 7, 2013) (citing *Anderson,* 477 U.S. at 248). Moreover, on a motion for summary judgment the court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir. 2003) (citing *Anderson,* 477 U.S. at 255).

Once the moving party has met its burden of production, the non-moving party cannot rest on mere allegations or denials of his pleadings, but must present "significant probative evidence in support of his complaint to defeat the motion for summary judgment." *Dearing, 2*013 U.S. Dist.

LEXIS at * 8 (citing *Anderson,* 477 U.S. at 248). General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *Pierce v. Ohio Dept. of Rehab. and Corr.,* 284 F.Supp.2d 811, 822, (N.D. Ohio 2003) (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888-89, (1990)). Additionally, "[t]he mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party." *Dearing, 2*013 U.S. Dist. LEXIS at * 8 (citing *Anderson,* 477 U.S. at 252). Summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp v. Catrett*, 417 U.S. 317, 322 (1986); *see also Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

2. ARGUMENT.

a. **Plaintiff cannot demonstrate a Fourth Amendment violation**.

The Fourth Amendment protects persons from unreasonable search and seizures. In the prison environment, one's right to privacy is greatly diminished because prison officials must be afforded discretion in how they ensure the safety of inmates, staff, and the general public. *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005) (A prison officials "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves."). Plaintiff Fugate, having been found guilty by a jury of his peers during a fair trial, "does not have the same liberty interest as a free man." *District Attorney's Office For Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). In fact, it is a cornerstone of our criminal justice system that "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged," he is rightfully and "constitutionally deprived of his liberty." *Id*. at 69. For example, "the Fourth

Amendment proscription against unreasonable search and seizures does not apply with the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

The potential for prison riots, inmate violence, and escape attempts are realities that correctional facilities face on a daily basis. *Hanrahan v. Mohr*, 905 F.3d 947, 954 ("given the 'complex and intractable' problems of prison administration, we recognize that federal courts are 'ill-equipped to deal with the increasingly urgent problems of prison administration[.]"). This is particularly true at maximum security institutions, like SOCF. (Ex. E, Erdos dec., ¶2.) It is well recognized that prisons, by their very nature, "are dangerous places." *Johnson v. California*, 543 U.S. 499, 515 (2005).  "Prisons are necessarily dangerous places; they house society's most dangerous people in close proximity with one another." *Farmer v. Brennan*, 511 U.S. 825, 858 (1994) (J. Thomas concurring). "Inmates get [to prison] by violent acts, and many prisoners have a propensity to commit more." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). "Prisons, by definition, are places of involuntary confinement of persons who have demonstrated proclivity for antisocial criminal, and often violent, conduct… [and] have necessarily shown a lapse in the ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint[.]" *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). "[I]t is 'difficult to imagine an activity in which a State has a stronger interest…than the administration of its prisons.'" *Woodford v. Ngo*, 584 U.S. 81, 94 (2006).

In *Bell v. Wolfish*, the Supreme Court held that although a search of inmate was invasive, the state had a compelling interest in preventing the hiding and smuggling of weapons, drugs, and other contraband. 441 U.S. 520, 523 (1979).  In other words, these legitimate concerns outweighed a prisoner's notions of privacy. *Id.*  In *Wolfish*, the searches were conducted by officers to prevent contraband from being smuggled into a jail that held pretrial detainees. *Id.* at 524.  The Supreme

Court recognized that "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Id* at 545.  According to the Court, "maintaining institutional security and preserving internal order are essential goals" that can lead to the "retraction of retained constitutional rights of both convicted prisoners and pretrial detainees." *Id*. at 546. In other words, "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547.

As to any expectation of privacy from unreasonable searches retained by an incarcerated inmate, the Supreme Court recognized "given the realities of institutional confinement" any alleged "privacy" expected by an inmate "necessarily would be of a diminished scope." *Id*. at 557. The Supreme Court adopted a "balancing test," which requires "a balancing of the need for a particularized search against the invasion of personal rights that the search entails." *Id*. at 559. Ultimately, the Court held that the strip-searches after visitation were not unreasonable, and did not violate the federal constitution. *Id.* at 558.  In conclusion, the Court was quick to point out that federal courts must not "become increasingly enmeshed in the minutiae of prison operations," that courts must refrain from the "natural tendency to believe that their individual solutions to often intractable problems are better and more workable," and that "wide range of 'judgment calls'… are confided to officials outside the Judicial Branch of Government." *Id*. at 562.

In *Florence v. Bd. of Chosen Freeholders*, another pre-trial detainee case, the Supreme Court found that lower courts must not "ignore the realities of prison operations" when it rejected the argument that "prison searches" must be "conducted only pursuant to an enunciated general policy or when suspicion is directed at a particular inmate[.]" 566 U.S. 318, 328 (2012).  In other

words, "prison officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id*. The Supreme Court further recognized that "[e]xperience shows" that inmates often try "to smuggle prohibited items" in prison, by "using their rectal cavities or genitals for the concealment." *Id*. at 335. Rejecting the argument that guards must have some sort of cause to strip-search pre-trial detainees, the Court held that "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation was exaggerated." *Id*. at 330. As justification for affording prison officials such deference, the Court pointed to the fact that "[i]nmates commit more than 10,000 assaults on correctional staff every year and many more among themselves." *Id*. at 333. "The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Meachum v. Fano*, 427 U.S. 215, 229 (1976).

In his motion for summary judgment, Fugate asserts that because "security is such in the 'double doors' that absolutely nothing impermissible gets into or out of a cell[.]" (Doc. 54, MSJ, PageId# 266.) According to Fugate, there were no "legitimate security concerns" that warranted "the type of constant 'stripping out' which Defendant Erdos ordered be done to [him][.]" (Doc. 54, PageId# 267.) Fugate argues that Warden Erdos had had no penological justification for having his strip-searched three times a day, and only did so as a means to "harass, intimidate, and punish" him. (PageId# 268.) The only evidence he has to support his claims is an email from James Whitman that states "Per Warden Erdos Inmate Fugate is to be shookdown at the beginning of every shift!" (Doc. 54-1, PageId# 281.) First, this is hearsay. Second, it is not "substantial evidence" that Warden Erdos's decision to have Plaintiff cell and body searched for weapons during every shift was an exaggerated response. In J1, under post-orders, Fugate's cell was required to be searched every day during first and second shifts, and he was required to be strip-

searched when he left his cell. (Ex. E, Erdos, ¶6, 7, 8.) In fact, Fugate had attacked an inmate, and a staff member with a weapon, within a short period of time. (Exs. O, P, RIB docs.)   It was reasonable for Warden Erdos to be concerned that Fugate could hurt someone else in an attempt to obtain a transfer at OSP. (Ex. E, Erdos, ¶9 & 10.)

In his motion, Fugate relies heavily on *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 511 (S.D.N.Y. 2008) and *Sher v. Engelke*, 943 F.2d 921 (8th Cir. 1991). (PageId## 267-268.)  *Jean-Laurent* and *Sher* are both clearly distinguishable from this case. In *Jean-Laurent*, the trial court denied summary judgment to Defendants because there was an issue of fact as to whether the inmate was searched in front of other inmates. *Id*. at 511. In this case, there is no such allegation, much less proof, that Plaintiff was strip-searched within the view of other inmates. In *Scher*, a guard repeatedly searched the plaintiff's cell, for no justifiable reason, after the inmate got his fellow guard fired. *Sher*, 943 F.2d at 923. Also, the defendant-guard testified that he had "no reason to believe that Scher had contraband in his cell when conducted the searches." *Id*. at 924. In contrast, in the present case, Warden Erdos had legitimate concerns that Plaintiff, based on his recent conduct, was a threat to both staff and other inmates. Plaintiff had just attacked a staff member, and a homemade weapon was found at the scene of the incident. If Plaintiff was going to attack another person, Warden Erdos was reasonably determined he was not going to do so with a contraband weapon.

Plaintiff can point to nothing in the record, other than his own speculation, that proves Warden Erdos' order that Plaintiff be searched three times a day, for thirty days, was intended to be punitive. He can only point to his own self-serving statement, based solely on an alleged unlikelihood that he could obtain another weapon while in J1. According to Plaintiff, these facts alone somehow demonstrate Warden Erdos' motive must have been punitive, and that his reaction

was over-the-top. However, Plaintiff offers no actual evidence that it is impossible for contraband weapons to be smuggled in J1. In fact, Warden Erdos disputes that contention. According to Erdos, he had Fugate searched on third shift because he was concerned an inmate porter might smuggle him a weapon at the end of second shift after searches were conducted. (Ex. E, Erdos, ¶ 10.) There are no versions of facts in this case that would support a Fourth Amendment claim against Defendant Erdos and therefore, Plaintiff is not entitled to summary judgment on this claim.

### b. **Plaintiff cannot demonstrate an Eighth Amendment violation**.

The original understanding of the Eighth Amendment was to proscribe punishments that equated to "torture" and "unnecessary cruelty[.]" *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878). However, the Supreme Court recognized that the Eighth Amendment "could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). As to Plaintiff's Eighth Amendment claim, where conditions of confinement are not actually "meted out punishment by [a] statute or sentencing judge," prison officials can only impose "punishment" if they "act with a sufficiently culpable state of mind." *Seiter*, 501 U.S. at 300. Hence, "infliction of punishment is a deliberate act intended to chastise or deter." *Id*. In other words, an inmate must show that state official acted with "'obduracy and wantonness' rather than 'inadvertence or error in good faith[.]'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018), citing, *Seiter*, 501 U.S. at 299. "In contrast to the reasonableness standard of the Fourth Amendment, the Eighth Amendment standard focuses on the official's 'obduracy and wantonness,' [cite omitted] asking 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002), citing, *Whitley v. Albers*, 475 U.S. 312, 319 (1986). In the context of strip-searches, Plaintiff cannot show deliberate

indifference, unless the strip-searches were "undertaken maliciously and sadistically." *Cornwell v. Dahlberg*, 963 F.2d 912, 918 (6th Cir. 1992) (Ct applied *Whitley* standard in strip-search case.); *See also*, *Parkell v. Danberg*, 833 F.3d 313, 336 (3rd Cir. 2016) (no evidence of maliciousness even though inmates in isolation were strip-searched three times a day.).

Again, Plaintiff has proffered no evidence that conclusively shows Warden Erdos acted maliciously. At best, Plaintiff speculates that Warden Erdos acted maliciously. However, Warden Erdos, based on Fugate's recent conduct and desire for a transfer to OSP, had legitimate concerns that Plaintiff was a likely threat to both staff and other inmates. (Ex. E, Erdos, ¶9 & 10.) Plaintiff admits that not only did he attack an ODRC staff member, but that he planned to do so. (Fugate Depo., p. 7.) Because Plaintiff cannot prove at this juncture what Warden Erdos' motives actually were, and can point to no evidence that his motives were malicious, he is not entitled to judgment as a matter of law on his Eighth Amendment claim.

## IV.    CROSS-MOTION FOR SUMMARY JUDGMENT.

### 1. STANDARD.

As the facts and analysis clearly show, Defendant Erdos is entitled to judgment as a matter of law on the Fourth and Eighth Amendment claims against him. As the Supreme Court of the United States has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When opposing parties tell two different stories—one of which is blatantly contradicted by a video record so that no reasonable jury could believe it—a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  Instead, those facts should be viewed "in the light depicted by the videotape." *Id.* at 381.

On summary judgment review, the court must determine whether the evidence presents a sufficient dispute of material fact so as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at, 251-52. Where, however, a plaintiff's version of the facts is "conclusively contradicted by the record that no reasonable jury could believe it", a Court need not rely on the nonmovant's version that is so "utterly discredited by the record" as to render it a "visible fiction." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). Furthermore, as established by the Sixth Circuit in *Reich v. City of Elizabethtown*, 945 F.3d 968, (6th Cir. 2019) "[t]hough we view the facts in the light most favorable to [the non-moving party], we note that [his] version of events only faintly resembles the picture offered by the officers, the eyewitnesses, and the medical evidence." Thus, "all *reasonable* inferences are drawn in favor of the plaintiff, to the extent supported by the record." *Reich v. City of Elizabethtown*, 945 F.3d at 980 (quoting *Chappell*, 585 F.3d at 909) (emphasis in original).

2.  ARGUMENT.

a.  **Defendant Erdos is entitled to judgment on Plaintiff's Fourth Amendment claim.**

The constitutionality of strip searches in prisons "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013). The test was outlined by the Sixth Circuit:

> The constitutionality of the *searches* at issue in this case involves a three-step analysis. First, we determine the nature of intrusion, "examin[ing] the scope, manner, and location of the *search*." *Stoudemire, 705 F.3d at 572*. Second, we "evaluate the need for the *search*, giving due deference to the correctional officer's exercise of her discretionary functions." *Id.* And third, "we determine whether the *search* was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

*Sumpter v. Wayne Cty*., 868 F.3d 473, 483 (6th Cir. 2017). "An intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system." *Sumpter*., 868 F.3d at 483. The passing of weapons, and other contraband, can escape "unnoticed by even the most vigilant observers." *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984). To that end, strip searches serve a legitimate interest because they "are designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches." *Florence*, 566 U.S. at 334. The Fourth Amendment only protects prisoners from strip searches that go beyond these legitimate penological interests. *Id*. at 330.

An inmate's privacy interests "must yield" to safety considerations in a correction's setting. *Sumpter*, 868 F.3d at 483. Pertaining to scope of a search, if the strip search occurs in a location where others can observe, it is considered more invasive. *Stoudemire v. Mich. Dep't of Corr*., 705 F.3d 560, 573 (6th Cir. 2013). When evaluating the need for a strip search, courts suggest that exigent circumstances can justify a strip search. *Id*. at 573-74. Furthermore, strip searches, conducted after an increasing number of stabbings and murders occurred, were upheld as a reasonable way to manage the emergency crisis and remove the weapons. *Elliott v. Lynn*, 38 F.3d 188, 191 (5th Cir. 1994). Also, searches can be based on reasonable suspicions. *United States v. Warfield*, 404 F. App'x 994, 997-998 (6th Cir. 2011). Prisons have a legitimate penological interest

in removing weapons, and other contraband, because they disrupt and are a danger in the prison setting. *Florence*, 566 U.S. at 332.

Plaintiff's searches, though frequent, were not particularly intrusive. Fugate's cell was searched pursuant to policy every day on first and second shift, given that he was placed in J1 for attacking an officer who was in the process of reviewing his recent attack on another inmate. (Ex. O & P, RIB records; Ex. E, Erdos, ¶3 & 5.) Thus, Fugate was placed in J1 "where inmates are housed who have committed the most violent offense[s][.]" (Ex. E, Erdos dec., ¶7.) Pursuant to post-orders at the time, inmates celled in the slammer cells, and double cells had their cells searched, and they were strip-searched in the shower every day on first and second shifts. (Ex. E, Erdos, ¶7.) These searches were conducted in manner where prisoner/guard interaction were minimized: the guards cuff the inmates at the cuff-port and leaves the cell block. The cell door is electronically opened, and the inmate walks of his own accord to the shower room to be secured and searched. (Ex. E, Erdos, ¶ 8.) After the inmate is searched, his cell is searched for contraband. (*Id*.) After the search is completed, the inmate is allowed to walk back to his cell handcuffed, and once he enters his cell, the guard removes the cuffs by way of the cuff-port. (*Id*.) There is no evidence that the strip-searches were conducted in a manner meant to embarrass or demean the Plaintiff, or performed in front of other inmates or female guards. Rather, they are conducted in the shower room.

Given Fugate's recent violent conduct, the need for the cell searches, and accompanying strip searches, is obvious. As stated previously, Fugate admittedly planned and attacked a hearing officer with a weapon. (Ex. Q, Fugate depo., p. 7.). Whether or not it was used during the attack, a homemade weapon—flattened battery casing with a sharpened edge—was found at the scene where the incident occurred. (Ex. M, Cooper dec., ¶4.) Fugate pled guilty at RIB to the charge of

having a weapon. (Ex. P, RIB docs., p. 8.) Plaintiff told the nurse in the infirmary that his motive was his desire for a transfer to OSP. (Ex. D, U of F Rpt., Medical Exam Rpt., p. 53.) Concerned for the safety of staff and other inmates, Warden Erdos reasonably chose to have Plaintiff's cell and body searched on third shift out of fear he might get passed a weapon by inmate porters at the end of second shift. (Ex. E, Erdos, ¶10.) Warden Erdos reasonably believed that Plaintiff might attack another inmate or staff until he got the transfer he desperately sought. (Ex. E, Erdos, ¶ 9-10.) The strip searches only lasted thirty days until Warden Erdos was assured Plaintiff did not have, or could not obtain, another weapon. (*Id*.) Given that Plaintiff had recently attacked another inmate, and then a member of staff, Warden Erdos had every reason to believe that Fugate was particularly dangerous.

The searches ordered by Defendant Erdos were reasonably related to a legitimate penological interest, which outweigh Plaintiff's expectation of privacy (which is minimal for inmates at the best of times in a corrections setting). In a matter of weeks, Plaintiff had attacked an inmate and a staff member. He was placed in a particular cell, in J1, which are reserved for "inmates deemed particularly dangerous." (Ex. E, Erdos, ¶7.) Warden Erdos had particularized concerns that Fugate would attack somebody else until he got the transfer he sought. (Ex. E, Erdos, ¶ 9 & 10.) Given that the searches were conducted in the showers, outside the presence of other inmates and female guards, the need for the searches to maintain safety outweighed Fugate's individual privacy concerns.

### b. Defendant Erdos is entitled to judgment as to Plaintiff's Eighth Amendment claim.

Plaintiff cannot show Warden Erdos acted with criminal recklessness when he had Plaintiff strip searched every shift for thirty days, much less that he acted maliciously and sadistically. As Fugate fails to "point to any evidence of maliciousness," he fails to offer any evidence to support

his contentions that Erdos acted with requisite intent. *Danberg*, 833 F.3d at 336 (Plaintiff's Eighth Amendment claim failed where inmate searched three times a day, guards visually inspecting his private regions). Again, Plaintiff attacked a staff member, and an inmate, within a short period of time. (Exs. O, P; RIB docs.)  SOCF had a rash of assaults where weapons were used. (Ex. E, Erdos, ¶4.)  A weapon was found at the scene where Plaintiff attacked Anderson. (Ex, E, Erdos, ¶9; Ex. M, Cooper, ¶4.)  Plaintiff was taken to J1, and housed in a cell where searches were routinely conducted during first and second shift. (Ex. E, Erdos, ¶7.) When an inmate leaves his cell at J1, in order to allow guards to search his cell, he is strip-searched in the shower. (Ex. E, Erdos, ¶8; Ex. F, Whitman, ¶7.) Because Warden Erdos had reasonable concerns that Plaintiff might attack somebody else in an effort to obtain a transfer to OSP, he made the decision have Fugate searched on third shift. (Ex. E, Erdos, ¶10.)  Plaintiff has no evidence that Erdos' decision to have him strip-searched on third shift was malicious or sadistic.  In fact, Erdos had concerns that a porter might smuggle him a weapon after the searches during second shift were completed. (Ex. E, Erdos, ¶10.) Fugate had proven himself to be a particularly violent inmate, and thus Warden Erdos ordered that extra precautions be taken to prevent him from hurting anyone else. All Plaintiff can prove is that he was searched three times and day, and his personal belief that these searches were unnecessary. Thus, there is a total lack of evidence supporting his contentions of maliciousness. In fact, given Plaintiff's recent conduct, Warden Erdos had ample justification to have him, and his cell, searched three times a day for thirty days.

### c.  Warden Erdos is entitled to Qualified Immunity.

Warden Erdos is also entitled to qualified immunity, which precludes recovery in this case. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory and constitutional rights which a reasonable person

would have known.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). Plaintiff Fugate shoulders the burden of showing that Warden Erdos is not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

A right is clearly established when "every reasonable official would [have understood] that what he is doing violates that right." *Reichie v. Howards*, 132 S.Ct. 2088, 2093 (2012). Thus, for a right to be "clearly established… [the] existing precedent must have placed the statutory or constitutional right question beyond debate." *Ashcroft v. al-Kid*, 563 U.S. 731, 741 (2011). In other words, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id*. at 743. To overcome a qualified immunity defense, "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitely unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Mullenix*, 136 S.Ct. at 308. "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). The relevant inquiry must take into account the "specific context of the case, [and] not as a broad general proposition," and determine "whether the violative nature of the particular conduct is clearly established." *Mullenix*, 136 S.Ct. at 308.

In the Fourth Amendment context, qualified immunity is particularly important given "the governing ad-hoc interest-balancing test," which is "sometimes difficult for an officer to determine how the relevant doctrine… will apply to the factual situation the officer confronts." *Sumpter*, 868 F.3d at 385. In other words, "case-by-case incremental decision making of balancing tests" rarely "provide the fair notice… that qualified immunity precedent requires." *Id*. Thus, "it is imperative"

that the Plaintiff put forth a "a decision that 'squarely governs' the outcome of the case." *Id*. In *Sumpter*, the Sixth Circuit rejected the legal proposition that a "strip searches must be supported by a legitimate justification" was sufficient to place defendants on notice of clearly established law, as it was far to general. *Id.*at 487. According to the panel, "when the constitutional test is one of interest-balancing, the point at which the constitutional shades into unconstitutional will necessarily be gray." *Id* at 488.  Most of the cases regarding strip-searches involve guards who strip-search inmates in full view of other inmates or the searches are conducted in close proximity to members of the opposite sex. See, *Williams v. City of Cleveland*, 771 F.3d 945 (6th Cir. 2014); *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560, 572 (6th Cir. 2013).

In his motion, Fugate relies heavily on *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 511 (S.D.N.Y. 2008) and *Sher v. Engelke*, 943 F.2d 921 (8th Cir. 1991). (PageId ##267-68) Those cases could not have placed Warden Erdos on notice that his order was unlawful. In *Jean-Laurent*, the trial court denied summary judgment to Defendants because there was an issue of fact as to whether the inmate was searched in front of other inmates. *Id*. at 511. Again, in this case, there is no allegation, much less proof, that Plaintiff was searched in front of other inmates. In fact, Plaintiff never contends he was strip-searched in the view of other inmates. In *Scher*, a guard repeatedly searched the plaintiff's cell, for no justifiable reason, after the inmate got his fellow guard fired. *Sher*, 943 F.2d at 923. Also, the defendant-guard testified that he had "no reason to believe that Scher had contraband in his cell when conducted the searches." *Id*. at 924. In that case, a rogue guard admittedly had no legitimate bases for his searches, basically conceding his motives were punitive. In the present case, Warden Erdos had legitimate concerns that Plaintiff, based on his recent conduct, was a threat to both staff and other inmates, and ordered that his cell be searched, and he be strip-searched, during every shift. Defendant Erdos' order was reasonable given the

20

circumstances and did not violate clearly established statutory and constitutional rights of which a reasonable person would have known.

## V.    CONCLUSION

For all the reasons set forth above, Defendant Erdos respectfully requests that this Court deny Plaintiff's motion for summary judgment and grant summary judgment in favor of Defendant Erdos as to the Fourth and Eighth Amendment claims against him.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ *Thomas E. Madden*
THOMAS E. MADDEN (0077069)
Senior Assistant Attorney General
Criminal Justice Section, Corrections Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215
Phone: (614) 995-3234
Fax: (866) 239-5489
Thomas.Madden@OhioAttorneyGeneral.gov

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Defendants' Response to Plaintiff's Motion for Summary Judgment (Doc. 54) and Cross Motion for Summary Judgment* was filed via electronic transmission on September 25, 2020, and was sent by regular, first-class mail to Karl Fugate, #A528-949, Ohio State Penitentiary, 878 Coitsville-Hubbard Road, Youngstown, OH 44505 on September 28, 2020.


*s/Thomas E. Madden*
THOMAS E. MADDEN (0077069)
Senior Assistant Attorney General