FILED
RICHARD W. NAGEL
CLERK OF COURT

20 NOV -2 PM 2: 30

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KARL FUGATE,
— PLAINTIFF

V.

RON ERDOS, ET AL.,
— DEFENDANTS

CASE NO. 1:19-CV-00030

JUDGE MATTHEW W. MCFARLAND
MAG. J. STEPHANIE K. BOWMAN

## PLAINTIFF'S RESPONSE TO THE DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Both the Plaintiff and the Defendants have moved for Summary Judgment in this case, and since the Defendants are trying to persuade this court to issue a ruling contrary to what the facts make clear as being a truly just one, the Plaintiff therefore feels the need to provide a response to the Defendants' Cross-Motion (Doc #60) in the making of things perfectly clear.

There are two distinct parts to this case:

1. Plaintiff's 8th Amendment claim stemming from the initial beating suffered at the hands of the Defendants in the infirmary;
2. Plaintiff's 8th and 4th Amendment claims stemming from the post-beating punishments ordered by Defendant Erdos himself.

In their Cross-Motion for Summary Judgment the Defendants focus ex-

clusively on the latter part of the case, so the Plaintiff therefore confines his response to that as well.

First of all the Plaintiff notes that there is no issue of material fact here. In Doc. #60 filed by the Defendants on Sept. 25th, 2020, it is acknowledged that Warden Erdos ordered that Plaintiff be strip-searched three times a day for thirty consecutive days: once on 1st shift, once on 2nd shift and once on 3rd shift (Pg. 11). As well is it acknowledged that the Plaintiff was confined in S.O.C.F.'s most secure housing unit during this time (J-1) in a so-called "Slammer-cell" which had two doors to it. See Page 16.

The only question here is whether or not the Defendants actions violated the Plaintiff's 4th and 8th Amendment rights under the U.S. Constitution. The Defendants assert NO, since the systematic stripping of the Defendant had a legitimate penological interest, namely to ensure that the Defendant didn't acquire a weapon to possibly assault another staff member with. The Defendants argument simply doesn't hold water, however.

The Defendants admit that J-1 is where S.O.C.F.'s most problematic inmates are housed, J-1 being where inmates are under the tightest of controls and the most complete isolation: a pea at the very centre of a nesting doll an inmate in J-1 is, there in his "slammer cell" behind two doors.

The Defendants assert that at the time (Pg. 16) all inmates in J-1 were stripped twice a day, once on 1st shift and once on 2nd, but that Warden Erdos thought it appropriate to intensify standard protocols by having the Plaintiff pulled out of his cell and stripped on third shift as well. Why? Well, as the Defendants state on Pg. 18 of Doc. #60, it was due to the possibility that the Plai-

ntiff might've been slipped a weapon AFTER staff had conducted their 2nd shift searches. Quote:

"Plaintiff has no evidence that Erdos' decision to have him strip-searched on third shift was malicious or sadistic. In fact, Erdos had concerns that a porter might smuggle him a weapon after the searches during second shift were completed."

Note how it is specified that a 'porter' might be a weapons-smuggler. You see, J-1 is an isolation block, and as such the only inmates to be found therein are those contained in the cells or those who are let in to clean the showers, the floor area outside of the cells and the officers station: these inmates being referred to as 'porters'. And in a relatively small housing unit like J-1, there will only be a single porter admitted at any given time.

Now let us set aside the fact that it is a **LIE** that all inmates housed in J-1 are — or have ever been — systematically stripped on 1st and 2nd shift, every day as a matter of routine. As a matter of fact, the only ones who are stripped as a matter of routine are the inmate porters, as they enter such highly restrictive environments like J-1 to work. Let us also set aside the fact that the only humans who could possibly smuggle anything to the plaintiff at this time would be they who possessed a **key** to the double doors, behind which the plaintiff sat like a pea at the centre of a nesting doll.

Instead let us just focus on the fact that the inmate porter doesn't remain in the block for the ENTIRETY of 2nd shift. Second shift starts at 2 pm and the porter arrives a little after 4 pm to assist with the serving of chow, clean up and trash collection, after which he leaves. No porters remain in the

isolation blocks after 6 or 7 PM. Second shift ends at 10 PM.

If Warden Erdos was concerned about an inmate porter possibly smuggling the plaintiff a weapon after staff had conducted their 2nd shift stripping of him, the self-evident solution to this potential problem was simply for him to order his staff to conduct their search after the inmate porter had left the block. Instead he orders them to rouse the plaintiff on third shift too, in the dead of night — just a few hours before 1st shift would be in to do it again.

The situation here is akin to a naked man chained to a wall, and his captors issuing an order that he be cavity-searched three times a day. Systematically. Where's the legitimate penological need to do this? Answer: It doesn't exist. So why then did Warden Erdos do this? I think that the exclamation point with which his order was issued speaks volumes. See the e-mail attached as an exhibit to plaintiff's motion for summary judgment.

Speculation aside, the fact of the matter is that the evidence before this Court plainly establishes that there was no legitimate penological interest being served by having the plaintiff stripped three X daily for 30 consecutive days, though the defendants think that there was. Their reasoning not being that which was set forth in their cross-motion for summary judgment, however.

The defendants are possessed of a mentality that dominates the operation at S.O.C.F, that mentality being one which believes in the deliverance of corporeal punishment to those inmates deemed to have "crossed the line". This mentality is what's on display as the plaintiff is escorted down to the infirmary whereat his initial beating would occur, in a back-room set aside for

that purpose. It's what also drove staff to implement their post-beating regimine of stripping the plaintiff as they did, three times a day for 30 days straight.

They think that by being brutal with inmates they'll keep themselves safe, through the instilling of such fear that none will dare to "step out of line". What this approach of theirs does, however, is to instill their charges with desperation, hate, and the determination to make their strike 'count' when the decision to move is made. Making everyone decidedly less safe there. Like your average criminal, these people have to be made to adhere to the law and thus serve the higher good.

If they're not held accountable here after they've been caught red-handed, it will be taken as a green-light to continue with their criminality.

10·12·20

Respectfully Submitted,

x Karl Fugate
KARL FUGATE # A528-949
O.S.P.
878 Coitsville-Hubbard Rd.
Youngstown, Ohio 44505

## Verification

I, Karl Fugate, do certify under the penalty of perjury that the facts contained herein are true and correct.

x Karl Fugate

10·12·20

Dear Clerk for the U.S. District Court,

Please find enclosed my "Response to the Defendants Cross-Motion for Summary Judgment," in Case No. 1:19-cv-00030. Please file with the Court. Thank-you.

Sincerely,

Karl Fugate
# A528-949
O.S.P.
878 Coitsville-Hubbard Rd.
Youngstown, Ohio 44505

· cc file ·



Karl Fugate # A[REDACTED]
O.S.P.
878 Coitsville-Hubbard Rd.
Youngstown, OH 44505

U.S. District Court; Southern Dstr. of Ohio
Potter Stewart U.S. Courthouse
100 East Fifth St. Room 103
Cincinnati, Ohio 45202