**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KARL FUGATE,                                                    Case No. 1:19-cv-30

           Plaintiff,                                    McFarland, J.
                                                                        Bowman, M.J.
    v.

RONALD ERDOS, et al.,

           Defendants.

**REPORT AND RECOMMENDATION**

Plaintiff, presently incarcerated at the Ohio State Penitentiary ("OSP"), filed a civil rights complaint against officials at the institution at which he was previously incarcerated, Southern Ohio Correctional Facility ("SOCF"). The parties have filed cross-motions for summary judgment that have been referred to the undersigned magistrate judge pursuant to local practice.  For the following reasons, I recommend that Plaintiff's motion be denied, that the cross-motion of Defendant Erdos also be denied, and that a separate cross-motion filed jointly by four Defendants be granted in part and denied in part.

**I.     Background**

SOCF is a maximum security prison located in Lucasville, Ohio. During his incarceration there, Plaintiff assaulted a fellow inmate and later, a correctional officer.  He complains that the Defendants violated his constitutional rights in retribution for Plaintiff's assault on staff.  Specifically, he alleges that after he assaulted the officer, multiple officers transported him to a room inside the SOCF infirmary where no cameras were present and used excessive force in violation of the Eighth Amendment.  Plaintiff was

transported by squad to the Ohio State University Emergency Room at the direction of SOCF medical staff on the date in question. Following his return to SOCF, Plaintiff was confined to a "slammer cell" and strip searched 3 times per day for 30 days pursuant to the order of Warden Erdos. He alleges that the thrice-daily strip searches violated the Fourth and Eighth Amendments.

Upon initial screening of Plaintiff's complaint, the undersigned filed a Report and Recommendation ("R&R") that recommended the dismissal with prejudice of several claims, including claims against the identified Defendants for monetary damages in their official capacities. However, the same R&R, subsequently adopted as the opinion of the Court, allowed Plaintiff's Eighth Amendment claims against Defendants Fri, McCoy, Felts and Eshem[1] and the Fourth and Eighth Amendment claims against Defendant Erdos to proceed. (Docs. 4, 7). The Court later denied Defendants' motions to dismiss all claims, clarifying that the referenced claims could proceed against all five Defendants for monetary damages in their individual capacities.[2] (Docs. 34, 37). Following discovery, the parties filed cross-motions for summary judgment.

## II.     Summary Judgment Standard and the Record Herein

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the

---

[1]Defendant Eshem is no longer employed by ODRC.
[2]The Court granted Defendants' motion to dismiss without prejudice a claim seeking to prevent "ODRC from ever sending him back to SOCF," "insofar as Plaintiff has agreed to voluntarily dismiss those claims without prejudice and has amended his complaint to do so." (Doc. 34 at 8).

evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Rule 56(c) states that parties must cite to "particular parts of materials in the record, including depositions, documents…affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials" or alternatively by showing that the adverse party "cannot produce admissible evidence to support the fact." This Court must consider the cited materials, but "may" consider any other materials in the record.[3] Rule 56(c)(3). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-49. The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252.

Where both parties have moved for summary judgment, the Rule 56 standard remains the same. Thus, in evaluating Plaintiff's pending motion, the Court will construe any factual disputes in favor of the Defendants. By contrast, in evaluating whether Defendants should prevail on their cross-motions for summary judgment, the Court has

---

[3]In this case, the undersigned has considered portions of Plaintiff's deposition testimony not cited by either party. (Doc. 78-1). Defendants attached part of the deposition in their responses in opposition to Plaintiff's motion and as an exhibit in favor of their cross-motions. (*See, e.g.*, Doc. 63-16). However, the referenced pages stopped short of any testimony related to the central claims in this case. Defendants did not file the full transcript as required by Local Rule 5.4 until ordered to do so. Given Plaintiff's frequent complaints that he is not permitted to retain legal documents relevant to this case in his cell, and Defendant's assertion of allegedly "uncontested" facts, the undersigned reviewed the full deposition in the interests of justice and under Rule 56(c)(3).

drawn all reasonable inferences in Plaintiff's favor. The following findings of fact distinguish between the differing parties' versions of material facts.

### III.    Findings of Fact[4]

The events in question began on January 17, 2017, when Plaintiff was transported in full restraints from his cell[5] to a Rules Infraction Board ("RIB") room for a hearing related to an assault on another inmate. Plaintiff testified that prior to reaching the hearing room, he had formulated a plan to assault a hearing officer, C/O Anderson, with whom he had a conflict. (Doc. 63-16, Plaintiff's Depo. at 6-7). During the hearing, Plaintiff surreptitiously slipped out of one handcuff, although the cuffs remained attached to one wrist.

Plaintiff wanted to be transferred away from SOCF. He hoped that the RIB would increase his security classification, which would earn him a transfer to the Ohio State Penitentiary ("OSP").[6] (Doc. 66-3 at ¶3). Plaintiff was "visibly upset" when told that his security classification would not change and that he would remain at SOCF. (Doc. 63-6 at ¶3). After that disposition and while seated across from C/O Anderson, Plaintiff rose up and struck Anderson with a piece of metal later determined to be a sharpened piece of battery casing.[7] (Doc. 78-1 at 64). Plaintiff was motivated by Anderson's long-standing "harassment." (Doc. 78-1 at 36). According to a contemporaneous report by Anderson, the attack resulted in "a small (one-inch) laceration" to his cheek that required medical

---

[4]Defense counsel has attached identical exhibits to the two responses to Plaintiff's motion for summary judgment and to the separate cross-motions for summary judgment filed by the different Defendants. (See Docs. 60, 61, 62, 63). For the convenience of the Court, the undersigned primarily references the exhibits attached to the motion filed by Eshem, Felts, Fri and McCoy.

[5]Plaintiff's cell location prior to the January 17 incident is not identified in the record, but it does not appear to have been within the J1 segregated housing unit. (See Doc. 63-4 at ¶5, stating that "[a]fter the incident, per policy, he was taken to J1.").

[6]OSP is Ohio's highest-level security institution. (Doc. 63-4 at ¶12).

[7]The declarations and unsworn accounts of several witnesses, including Anderson, state that Anderson was struck with the ratchet of the handcuff attached to Plaintiff's wrist. (Doc. 63-3 at 55; see also Doc. 63-6 at ¶4; Doc. 63-7 at ¶4). Plaintiff admits he used the battery casing. (See Doc. 63-9 at ¶8). .

attention. (Doc. 63-3 at 12).

Officers activated the "man-down" alarm and two officers, Defendants Fri and McCoy, immediately tackled Plaintiff to the ground and delivered several closed-fist strikes to his face.  (Doc. 63-6 at ¶6; Doc. 63-7 at ¶6; *see also* Doc. 63-16 at 9).  Plaintiff testified that Fri and McCoy stopped after noticing a nearby camera.  Defendants assert that they punched Plaintiff because Plaintiff continued swinging his arms and resisting. (Compare Doc. 63-16 at 10-11 (Plaintiff's testimony denying resistance) with Doc. 66-3 at ¶¶ 5-7; Doc. 63-6 at ¶¶5-6; Doc. 63-7 at ¶¶5-7).  After re-securing Plaintiff, Fri and McCoy escorted Plaintiff from the hearing room to a holding cell. Plaintiff testified that C/O Fri tried to break his arm during the escort and that Sargent Felts explicitly instructed Fri to do so when they reached the holding cell. (*See* Doc. 63-16 at 14),  However, Fri avers that he "only used techniques I was trained to use for non-compliant inmates during an escort." (Doc. 63-6 at ¶ 7).  After a short stop at the holding cell, Defendants Fri and McCoy were relieved of their control of Plaintiff.  (Doc. 63-6 at ¶7; Doc. 63-7 at ¶8).

Defendant Felts and Sargent Bear, along with Defendant Lt. Eshem, resumed control of Plaintiff en route to the infirmary.  (Doc. 63-9 at ¶9). Just before reaching the infirmary, Plaintiff turned his head "to ask Felts something" and Felts responded by spraying Plaintiff with a chemical agent in the face.  (Doc. 63-16 at 20-21).  Defendant Felts' account differs.  He attests that he used the chemical agent only after "notic[ing] that Plaintiff was bleeding from his mouth" and hearing "a hocking sound as if he was ready to spit," followed by a "quick movement." (Doc. 63-9 at ¶6).[8]  Plaintiff denies that he

---

[8]No other witness noticed bleeding; other accounts state that Plaintiff turned aggressively and quickly toward Felts while continuing to resist during the walk to the infirmary. (*See, e.g.*, Doc. 63-3 at 16, 18, 25, 31, 35).  The medical record contains no reference to bleeding near Plaintiff's mouth.

was bleeding and testified he had no real injuries prior to his arrival at the infirmary, other than "extreme pain" to his arm and the effects of the chemical agent. (Doc. 78-1 at 15, 17, 24).

As a result of the chemical agent, Plaintiff was "blinded" except for "glimpses" of correctional officers.[9] (*Id.* at 23). Sgt. Bear departed after being impacted by the spray and C/O Charles Ruckel took his place. (Doc. 63-11 at ¶4).[10] Felts, Eshem and Ruckel then escorted Plaintiff into the infirmary.

Plaintiff asserts that the Defendants took him to the infirmary to beat him because there are no cameras there. Plaintiff testified that the officers put him in a side room and "started taking turns punching on me," beating him until he lost consciousness. (Doc. 78-1 at 25-27). However, Defendants Felts and Ruckel state that they merely placed Plaintiff in a holding cage located in the infirmary "until he could be seen by medical staff," (Doc. 63-9 at ¶7), and that he was subsequently examined by a nurse. (Doc. 66-11 at ¶5).[11] Defendants deny the use of any force in the infirmary. (Doc. 63-9 at ¶7, Felts' statement that "[a]t no time was any force used on Plaintiff while he was in the infirmary."; Doc. 66-11 at ¶5, Ruckel's statement that "[a]t no time did I observe any guards assault Plaintiff in the infirmary."). A Use of Force ("UOF") investigatory report contains a statement from Lt. Eshem that Plaintiff resisted when he was "being taken out of the cage to see the nurse" and that Eshem and Ruckel "had to take control" of his arms at that time. (Doc.

---

[9]Plaintiff testified that this symptom continued until he was en route to the hospital, at which time a nurse washed his eyes out with water. (Doc. 63-16 at 23, Doc. 78-1 at 40; *see also* Doc. 63-3 at 3 and 15 (Eshem's UOF statement that decontamination was begun after Plaintiff "was removed from the area" but that Plaintiff "was unable to take a shower due to being on a trip")).

[10]Neither Bear nor Ruckel were named as defendants.

[11]Defendants filed a similar Declaration by Defendant Eshem, but that Declaration is unsigned and therefore is not considered.

63-3 at 3, 10, 35).

Plaintiff testified to multiple injuries sustained in the alleged assault, including facial injuries and a gash to his forehead, an arm injury, a serious injury to his neck, and a concussion that made it difficult to remember some details. (*See* Doc. 78-1 at 43-46, 48). A Medical Examination Report ("MER") by an unidentified examining nurse found an "[a]brasion present to forehead. Laceration to right lateral brow. Edema and pink discoloration present on right ear and left lateral orbit." (63-3 at 4). The nurse contacted the physician for follow-up. Upon his examination, the physician, "ALP Conley," directed Plaintiff to be transported to the Ohio State University ER by ambulance. (Doc. 3 at 16; *see also* Doc. 63-3 at 8).

After his return to SOCF from the hospital, Plaintiff was placed in a segregated housing area identified as J1. Erdos attests that "J1 is where inmates are housed who have committed the most violent offense[s] until such time it is determined that [they] can be safely housed in an open front cell in another extended restrictive housing (ERH) cell block." (Doc. 63-4 at ¶6). All inmates in the J1 unit are "strip-searched every time they leave their cell, including when their cells are searched." (Doc. 66-2 at ¶5). Although there is no schedule for searching most inmates in J1, all are subject to "unplanned cell-search based on the discretion of security staff." (Doc. 63-4 at ¶6). Defendant Erdos states that "at that time, SOCF had a rash of serious assaults where inmates…had made and used home-made weapons" such that he had "previously ordered correctional staff to conduct more cell searches" throughout SOCF in order to "obtain control of the situation." (Doc. 63-4 at ¶4).

Within the segregated J1 cell block, Plaintiff was placed in a "slammer cell," a

special cell "reserved for inmates deemed particularly dangerous to staff and other inmates," according to Captain Whitman.  (Doc. 66-2 at ¶5).  There are five such "slammer cells" in J1, plus one similar "double cell."   Plaintiff testified that slammer cells are not open to the J1 corridor but instead have 2 solid doors with only one small window, and an extra set of bars "around the whole unit." (Doc. 78-1 at 62).  Notwithstanding the more secure nature of the cells, under a "post order" issued by Defendant Erdos,[12] inmates in the slammer cells were to be searched during the first two shifts of the day.  (*Id.,* Doc. 63-4 at ¶7).  The twice-daily searches included both a cell search and a strip search of each occupant.  (*Id.* at ¶¶5-6).

Plaintiff's testimony suggests that he was initially the sole occupant of a slammer cell in J1, but that two additional inmates with charges of assault or planned assault on staff members soon joined him in adjacent slammer cells. (Doc. 78-1 at 65).  Plaintiff testified that only the three inmates charged with staff-related incidents were subjected to daily strip searches.  (Doc. 78-1 at 67).  In addition to the referenced post order requiring 2 daily strip searches of inmates in slammer cells, Defendant Erdos singled out Plaintiff to be subjected to a third search on the night shift.  In accordance with that order, Plaintiff was strip searched 90 times over the next thirty days.  (Doc. 63-4 at ¶¶ 8-9).  Plaintiff testified that searches generally were conducted at the beginning of each shift, around 6:30 a.m., shortly after 2 p.m., and between 10 p.m. and midnight, though occasionally it was "2:00 in the morning."  (Doc. 78-1 at 65, 68-69, 72).  He testified that during the strip searches, other officers were assigned to search his cell and would "demolish" his

---

[12]It is unclear whether the post order was written or verbal; no copy is contained in the record, and there is nothing to indicate the date it was entered or rescinded.

paperwork.  (Doc. 78-1 at 71).

The daily strip searches ended after 30 days, although Plaintiff remained in the same "slammer cell" for an additional one or two months.  (Doc. 78-1 at 76).  Plaintiff testified that "generally people are only left in [the] slammer cell for two weeks, you know, because it's so isolated…."  (Doc. 78-1 at 73).  After his release from the slammer cell, Plaintiff was transferred to a different "near…normal" cell in J1 until his transfer to OSP on June 6, 2017.  (Doc. 78-1 at 76; Doc. 63-4 at ¶12).  No contraband was ever discovered in Plaintiff's cell or on his body during the 90 strip searches conducted during Plaintiff's first thirty days in the slammer cell.  (Doc. 63-4 at ¶10).

## IV. Analysis of Eighth Amendment Excessive Force Claims Against Defendants Eshem, Felts, Fri and McCoy

Plaintiff moved for summary judgment against all Defendants. (Doc. 54).   In addition to their response to Plaintiff's motion, (Doc. 62), Defendants Eshem, Felts, Fri and McCoy filed a cross-motion for summary judgment. (Doc. 63).   Plaintiff filed a response to the cross-motion, (Doc. 72), to which Defendants filed a reply.  (Doc. 75). Plaintiff also filed a "final rebuttal" that amounts to an unauthorized sur-reply. (Doc. 79). Although Defendants have not moved to strike the sur-reply, the undersigned declines to consider it.  (*See* Doc. 35 at 3-4, expressly warning Plaintiff after he filed a similar unauthorized sur-reply that "this Court is unlikely to excuse" any future failure to follow the "leave of court" procedure required for a sur-reply).

### A. Defendants Eshem, Felts, Fri and McCoy are Entitled to Judgment for Use of Force in the RIB Hearing Room and During the Escort

Defendants acknowledge that Plaintiff's motion is limited to the force allegedly used against Plaintiff after he reached the infirmary. (Doc. 63 at 8).  In response to

Defendants' cross-motion, Plaintiff confirms that fact, and concedes that no Eighth Amendment violation occurred as a result of the use of force in the RIB hearing room or during the escort on the way to the infirmary. (*See* Doc. 72 at 13). Upon initial screening, the extent to which Plaintiff was asserting Eighth Amendment claims for events that occurred on January 17 prior to Plaintiff reaching the infirmary was unclear. To clarify the record, Defendants should be granted partial summary judgment for any use of force that occurred either in the RIB hearing room or during the escort to the infirmary.

### B. Defendants Fri and McCoy are Entitled to Judgment for the Alleged Use of Force in the Infirmary

Plaintiff now acknowledges that he may have been mistaken concerning the identity of the third officer who allegedly beat him in the infirmary. Although Plaintiff identified Fri as the third officer in his deposition, he also testified that his ability to visually identify the officers was limited due to the effects of OC spray. All other records confirm that neither C/O Fri nor C/O McCoy were present in the infirmary, and the undersigned finds that no reasonable jury could conclude to the contrary. Therefore, Defendants Fri and McCoy are entitled to summary judgment on all Eighth Amendment claims against them. (*See* Doc. 72 at 13, Plaintiff's response stating that he "doesn't object to …dismissal of the case against Officer Fri" if the court confirms he was not present).

### C. Defendants Felts and Eshem are not Entitled to Judgment for Any Use of Force in the Infirmary

Multiple issues of fact preclude summary judgment in favor of either Plaintiff or Defendants on Plaintiff's Eighth Amendment claim that Sgt. Felts and Lt. Eshem used excessive force against him in the infirmary on January 17, 2017.

### 1. Genuine Issues of Material Fact Concerning the Use of Force

Plaintiff's Eighth Amendment claim requires him to satisfy both an objective component, showing that the pain inflicted was "sufficiently serious," and a subjective component, which focuses on the state of mind of the prison official.  *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citations omitted).  It is unnecessary for an inmate to prove that he suffered from any significant injury requiring medical attention in order to prove the objective component of an Eighth Amendment claim involving cruel and unusual punishment, *see Wilkins v. Gaddy*, 539 U.S. 34, 37 (2010).  On the other hand, the extent of injury is one factor to be considered in determining whether the assertion of force "'could plausibly have been thought necessary' in a particular situation." *Id.,* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  Thus, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  Ultimately, the critical issue under the Eighth Amendment is not the extent of the injury, but rather, 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *See Wilkins*, 559 U.S. at 37 (quoting *Hudson v. McMillian,* 503 U.S. at 7).

Defendants argue that Plaintiff's version of the facts is so conclusively contradicted by the record so as to render it a "visible fiction."  *See Chappell v. City of Cleveland*, 585 F.2d 901, 906 (6th Cir. 2009).  Defendants first point to Felts' express denial that he assaulted Plaintiff in the infirmary, as well as to C/O Ruckel's statement that he did not observe any assault.  Defendants urge this Court to conclude that "there is no credible evidence that Defendants …assaulted Plaintiff in the infirmary."  (Doc. 63 at 18). Somewhat curiously given that Plaintiff is alleging that the assault occurred *after* he

entered the infirmary, Defendants also rely on Plaintiff's testimony that he "had no injuries *before* going into the infirmary." (Doc. 63 at 15-16, citing Doc. 78-1 at 24, emphasis added).

Although the Declarations of Felts and Ruckel create an issue of fact sufficient to deny Plaintiff's motion, the evidence falls short of the showing required to award summary judgment in Defendants' favor. In contrast to Felts' denial of force, Plaintiff testified that Defendants put him in a chair and "started taking turns punching on me," beating him until he lost consciousness. (Doc. 78-1 at 25-27). In essence, Defendants ask this Court to not only accept Felts' Declaration, but to reject Plaintiff's sworn deposition testimony as not "credible." A trial court may not make such credibility assessments on summary judgment; rather, all reasonable inferences are to be drawn in favor of the non-moving party.

Plaintiff contrasts his unrebutted testimony that he had no injuries prior to entering the infirmary with circumstantial evidence that he had significant injuries upon leaving the infirmary. The MER included among the UOF documents provides the following summary of physical findings:

> Adult male, alert and oriented, respirations even and unlabored. Pupils PERRLA bilaterally, clear speech during encounter, FROM noted to neck LROM noted to jaw. Abrasion present to mid forehead. Laceration present to right lateral brow. Edema and pink discoloration present above right ear. Edema and pink discoloration present to left lateral orbit and top of left lateral jaw. Ambulatory to infirmary with steady gait, no complaints of dizziness or reported loss of consciousness. FROM noted to extremities and digits.

(Doc. 63-3 at 53). The unidentified nurse documented cleaning and applying steri strips to close a laceration to Plaintiff's brow, vital signs, completing a "neuro check" and full body assessment. (*Id.*) Plaintiff also was given 800 mg of ibuprofen for pain and was

"offered" ice. The treatment notes do not reflect any decontamination (eye washing) or bandaging of Plaintiff's forehead. However, pictures attached to Plaintiff's motion for summary judgment reflect two large bandages covering most of Plaintiff's forehead. (*See, e.g.,* Doc. 54-1 at 5).

The MER further reflects that the nurse contacted a physician for "assessment of injuries and referral for treatment," after which Plaintiff was immediately "sent to OSU ER by squad per ALP Conley Instruction." (*Id.* at 53; *see also* Doc. 63-3 at 10, 13, 52 (confirming that Plaintiff was "transferred to the hospital for treatment.")). Plaintiff testified that when the "head doctor" arrived, he "took one look at me" and said "call an ambulance." (Doc. 78-1 at 32).

The evidence in Plaintiff's favor includes his deposition testimony, consistent statements throughout the UOF investigation and in grievances filed close-in-time to the events in question, and the referenced circumstantial evidence of the MER. (Doc. 63-3 at 1, 28; *see also* Doc. 3 at 13-20 (grievances)). Plaintiff testified that what was noted as an "abrasion" on his forehead was a significant injury caused by either Eshem or Felts punching him in the forehead while wearing a ring. (Doc. 78-1 at 27, "[w]hen I looked in the mirror at the hospital that ring print was on there in the middle of my forehead.").

In their reply, Defendants change course slightly. In lieu of relying on Plaintiff's testimony that he had <u>no</u> injuries prior to entry into the infirmary, they argue that the record reflects only "minor injuries" that "were clearly caused by the altercation that occurred in the hearing room" when Defendants Fri and McCoy "subdue[d] a violent inmate, immediately after Plaintiff admittedly attacked" Anderson. (Doc. 75 at 3). In support of this interpretation, Defendants argue that the MER reflects a level of injury that is

inconsistent with a severe beating. (Doc. 75 at 2). Defendants also suggest that the unsworn MER statement that Plaintiff had "no complaints of dizziness or loss of consciousness" undermines Plaintiff's sworn testimony that he lost consciousness. (*Id.*; *see generally* Doc. 78-1 at 28).[13] They point to the fact that the nurse only gave ibuprofen as indicative of the "minor" nature of injury, suggesting that the MER and lack of other medical records[14] "certainly do not support the imaginary beating Plaintiff allegedly sustained in the infirmary." (Doc. 75 at 3).

Even if this Court were to accept Defendants' construction of the evidence (which would be contrary to Rule 56 standards), the Sixth Circuit has reiterated that an "absence of serious injury is … relevant to the Eighth Amendment inquiry, but does not end it." *Lockett v. Suardini,* 526 F.3d 866, 875 (6th Cir. 2008) (quoting *Hudson*, 503 U.S. at 7); *see also generally Burfitt v. Bear*, Case No. 1:15-cv-730-SJD-SKB, 2016 WL 4992017 (S.D. Ohio Aug. 15, 2016) (denying dismissal of Eighth Amendment claim based upon allegations of bloody nose, abrasions, bruising and swelling). More importantly, Defendants' attribution of Plaintiff's injuries to the events in the RIB hearing room is one plausible explanation, but not necessarily the most plausible. Other than Felts' brief reference to Plaintiff's bleeding from the mouth to explain his use of a chemical agent,[15] there is no evidence to indicate that Plaintiff had any visible injury prior to entry into the

---

[13]Without putting too fine a point on the issue, the MER does not indicate whether Plaintiff was specifically asked about loss of consciousness.

[14]Plaintiff maintains that Defendants failed to produce all the medical records and pictures he requested, including pictures of Plaintiff's injuries taken in the infirmary before being transported to the hospital and following his return. (Doc. 72 at 17; *see also*, Doc. 48 and Docs. 39, 45). In part for procedural reasons, Plaintiff's attempt to file discovery requests in the record was stricken and his motion to compel was denied. (*See, e.g.,* Doc. 29, 51).

[15]Felts' statement is contradicted by Plaintiff's testimony, denying any blood anywhere on his face or other injury. (Doc. 78-1 at 15). Neither the MER nor other witness statements indicate bleeding from the mouth prior to entry into the infirmary.

infirmary. In fact, Plaintiff cites to the video evidence filed by Defendants of the escort as proof that he had no visible injuries at that time. Defendants do not dispute that there were no cameras inside the infirmary and that no other video exists to prove or disprove what occurred.

Undermining Defendants' characterization of Plaintiff's injuries as "minor," it is undisputed that the physician on duty immediately directed Plaintiff to be transported to an outside hospital emergency room. That fact constitutes strong circumstantial evidence of serious injuries. There are also references to an investigation by the Ohio State Highway Patrol in both the UOF documents and in Plaintiff's testimony. (*See* Doc. 78-1 at 76).[16] Based on the record as a whole, a reasonable jury could find that Plaintiff exhibited far more injuries after his stay in the infirmary than he did prior to his arrival. A reasonable jury further could conclude that those injuries were inflicted by the excessive use of force in violation of the Eighth Amendment.

### 2. Defendants Felts and Eshem are not Entitled to Qualified Immunity

In addition to seeking summary judgment based upon their denial of any assault, Defendants Felts and Eshem alternatively argue that they are entitled to qualified immunity. The undersigned disagrees.

The purpose of qualified immunity is to provide governmental officials with the ability "reasonably to anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (internal quotation omitted). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at

---

[16]The record does not include the result of that investigation.

the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). Here, any reasonable official would have understood that inflicting the force alleged by Plaintiff in the infirmary violated clearly established Eighth Amendment law.

### VI. Plaintiff's Fourth and Eighth Amendment Claims Against Warden Erdos

In response to Plaintiff's original motion for summary judgment, Defendant Erdos filed a separate cross-motion for summary judgment, to which Plaintiff filed a response, and Defendant Erdos filed a reply. (Docs. 61, 70, 73). Similar to the "final rebuttal" memorandum Plaintiff filed after Defendants Eshem, Felts, Fri and McCoy filed their reply memorandum, Plaintiff filed a "supplemental memorandum" that is construed as a procedurally unauthorized sur-reply. (Doc. 76). However, because the reply filed by Defendant Erdos presents an additional Declaration, and in the interests of justice, the undersigned will excuse Plaintiff's procedural error and consider the referenced sur-reply.

### A. The Fourth Amendment Claim

Plaintiff claims that the strip searches violated the Fourth Amendment, which protects individuals from unreasonable search and seizure. In a prison environment, one's right to privacy is greatly diminished because prison officials must be afforded discretion on how they ensure the safety of inmates, staff, and the general public. *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005). To satisfy Fourth Amendment concerns, searches "must be conducted in a reasonable manner." *Bell v. Wolfish*, 441 U.S. 520, 560 (1979). A search conducted in an abusive fashion "cannot be condoned." *Id.*

Plaintiff argues that the daily searches were abusive because Warden Erdos lacked any "legitimate security concerns" and instead ordered the searches as a means to "harass, intimidate, and punish" Plaintiff. (Doc. 54 at 4). Plaintiff cites to two cases to

16

support his claims. *See Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501 (S.D.N.Y. 2008) (denying summary judgment on claim that a strip search violated the Fourth Amendment, finding issues of fact concerning whether the inmate could have acquired contraband, and/or whether the search was designed to harass and intimidate); *Scher v. Engelke*, 943 F.2d 921 (8th Cir. 1991) (holding that excessively frequent cell searches conducted without a penological purpose, in retaliation for inmate's blowing the whistle on a corrupt guard, violate the Eighth Amendment). The undersigned finds no need to further discuss Plaintiff's two cases in light of controlling Sixth Circuit case law.

In *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560 (6th Cir. 2013), the Sixth Circuit acknowledged that any type of "strip search"[17] is far more intrusive than a mere cell search or other "pat-down" body search.

> "[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Wood v. Clemons,* 89 F.3d 922, 928 (1st Cir.1996). It is a practice that "instinctively gives us ... pause," *Bell,* 441 U.S. at 558, 99 S.Ct. 1861, since "[u]ndergoing such an inspection is undoubtedly humiliating and deeply offensive to many...." *Florence,* 132 S.Ct. at 1524 (Alito, J., concurring).

*Id.*, 705 F.3d at 572-573.

The determination of whether intrusive searches are constitutionally reasonable "involves balancing the need for the search against the privacy invasion resulting from the search." *Williams v. City of Cleveland*, 907 F.3d 924, 935 (6th Cir. 2018). Balancing those interests, courts have upheld strip searches when they are conducted as part of the

---

[17]The term "strip search" is often used as an "umbrella term" that encompasses a variety of behaviors, ranging from the conduct described in *Stoudemire* (stripping to underwear), to a visual inspection of a fully naked individual without scrutiny of body cavities, to a visual body-cavity search which may include inspection of anal and genital areas. The most invasive type of "strip search" would be a manual body-cavity search, involving "some degree of touching or probing of body cavities." *Parkell v. Danberg*, 833 F.3d 313, 327 (3rd Cir. 2016).

inmate booking process or after contact visits with someone outside the institution.  *See*, *e.g.*, *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510, 1518-20 (2012); *Bell*, 441 U.S. at 558. But there is no blanket exception to the need for constitutional scrutiny for searches conducted on violent inmates housed in maximum security facilities.  The *Williams* case summarized the critical inquiry to be undertaken by trial courts:

> This inquiry can be divided into three considerations: (1) the nature of the intrusion, considering "the scope, manner, and location of the search"; (2) "the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions"; and (3) "whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013) (citation omitted). We may also examine "obvious, easy alternatives that accommodate the inmate's privacy interests at little cost to valid penological objectives."

*Id.*, 907 F.3d at 935 (quoting *Salem v. Mich. Dept. of Corrections*, 643 Fed. Appx. 526, 530 (6th Cir. 2016) (additional citation omitted); *accord, Sumpter v. Wayne Cty*, 868 F.3d 473, 483 (6th Cir. 2017).

## 1. Degree of Invasion of Personal Privacy

The plaintiff in *Stoudemire* was a double amputee who was subjected to a strip search that required her to strip down to her underwear.  Reviewing the scope, manner and location of the search, the court affirmed the denial of summary judgment, holding that a reasonable jury could find for the plaintiff based upon circumstantial evidence that suggested that the search was "'undertaken to harass or humiliate' and not for any legitimate purpose."  *Id.*, 705 F.3d at 571.  Although the search was conducted in a cell, the evidence suggested that the defendant was aware that the search could be observed by other inmates in an adjacent hallway.  The officer refused to answer the inmate's query

for the reason for the search other than stating "because I can," and smirked during the search. The Sixth Circuit found that such evidence "may, in context, suggest personal animus and implicate the dignitary interest 'inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches.'" *Id.* at 573.

In an attempt to distinguish *Stoudemire*, Defendants point out that Plaintiff was taken to a private location (the shower) where he could not be observed by other inmates during the search. However, Plaintiff did not testify that no one else could observe the searches. Instead, he testified that multiple officers ("probably seven COs and a white shirt") arrived to conduct the first 6:30 a.m. search. (Doc. 78-1 at 61, 63). The evidence submitted by Defendant Erdos does not deny that multiple officers may have been present. A Declaration from Captain Whitman is silent as to the ability of other guards to observe, attesting only that the searches were conducted "in the shower room, outside the view of other inmates, by a male guard, supervised by a male supervisor." (Doc. 66-2 at ¶9; *see also id.* at ¶5 (stating that "[r]outinely, the prisoner, a guard, and a supervisor are present during a strip-search.")). Thus, the record creates a reasonable inference that on at least one occasion, Plaintiff was observed by more officers than were necessary for any penological purpose. But even if a reviewing court were to find no issue of fact concerning the extent to which Plaintiff had an audience, *Bell* and *Stoudemire* teach that courts must consider the totality of circumstances surrounding the scope, manner and location of a search.

Here, the searches at issue were more invasive than the single strip search at issue in *Stoudemire* in which the plaintiff was permitted to retain her underwear. Plaintiff Fugate testified to being forced to remove his underwear and spread his buttocks for

visual inspection three times per day for 30 days - equivalent to a visual body-cavity search. Defendant Erdos confirmed that the searches were performed under his express directive. (Doc. 78-1 at 66-67). The frequency, number, and type of strip searches - involving 90 visual body-cavity inspections within 30 days – gives this Court great pause.

Plaintiff's deposition provides evidence of personal animus by Erdos and the officers following his orders. Plaintiff testified that he was returned to SOCF from the ER visit around 11 p.m. on the evening of January 17 and was immediately put into a "slammer cell." Around 4 a.m. on the morning of January 18, Warden Erdos showed up at his cell and told him "you're not going to fucking OSP…you're going to stay right here." (Doc. 78-1 at 59-60; *see also id.*, testifying "this just ain't normal procedure…."). An email record dated a few hours later from Whitman to multiple SOCF officials contains a particularly emphatic subject line: "Per Warden Erdos Inmate Fugate is to be shookdown [sic] at the beginning of every shift!!!" (Doc. 54-1 at 9, emphasis original).

The officers assigned to perform the searches included the same Defendants (Felts and Eshem) who had assaulted him. While housed in J1, Sgt. Felts continually threatened Plaintiff that he would beat him up again the next time he returned to the infirmary. (Doc. 78-1 at 44). In addition to conducting the strip searches and threatening additional physical harm, Lt. Eshem would routinely tear up any written complaints that Plaintiff attempted to write and submit. (Doc. 78-1 at 69-70). Plaintiff testified that the officers would comment about his prior beating and make other comments suggesting an intent to humiliate him during the daily strip searches:

> You're sitting there naked in front of the same COs that just beat your ass
> and asking you, are you still sore, you know, it's going to happen again,
> sitting there fucking naked and then having to bend over in front of them
> telling every time you spread your cheeks, and this is happening every shift

for fucking 90 times.

(Doc. 78-1 at 77-78). Plaintiff drew a sharp contrast between the strip searches conducted while he was in the slammer cell with other strip searches, which he testified may have occurred as part of standard procedure after he was moved to a "damn near…normal cell" in J1 and "pretty much left… alone." (Doc. 78-1 at 76). He expressly denied that the 90 strip searches at issue were conducted like any "normal strip search."

> No, no, not like they was doing, no, laughing about it and making jokes about it and making sure that I – spread your cheeks, you do that right, no, that's not good enough you got to make sure you spread them all the way, you know, repeatedly. Try that for 90 days or 90 times.

(Doc. 78-1 at 78).

### 2. The Asserted Need for Frequent Visual Body-Cavity Searches

It is well-established that detecting and deterring contraband within the confines of a jail or prison is a legitimate penological objective. *Florence*, 132 S. Ct. at 1517. And courts will afford prison officials a great deal of deference in reviewing the legitimacy of stated penological objectives. Thus, "[a]bsent proof to the contrary, [a court] must assume that a search of a prisoner is initiated in an effort to detect and deter contraband." *Stoudemire*, 705 F.3d at 573. Here, Plaintiff arguably has presented some "proof to the contrary" to challenge the usual presumptive deference to the stated penological objectives for the post order requiring twice-daily strip searches on the specific inmates housed in slammer cells in J1. However, even if Plaintiff had presented no evidence to question Defendant's "post order" to conduct twice-daily strip searches, *Stoudemire* still would require this Court to examine "the need for the *particular* search at issue." *Id.* (emphasis original, internal quotation marks and citation omitted).

Defendant's cross-motion for summary judgment begins by assuming this Court

will accept the constitutionality of the post order that required twice-daily searches for any occupant of a slammer cell in J1, but not for those in other J1 cells, based upon the deference afforded to prison officials. The undersigned refuses to accept this premise on the record presented. Defendant cites to no case law that would suggest the presumptive constitutionality of a policy requiring such unusually frequent and invasive daily visual body-cavity searches. A court "must not confuse deference with abdication." *Stoudemire*, 705 F.3d at 572. Under the Fourth Amendment, there must be a valid, rational connection that reasonably relates the "post order" to a legitimate penological interest.

Defendant offers no evidence to indicate when the post order was entered. Plaintiff testified to his belief that the order was put into practice when Plaintiff was first housed in the slammer cell. The only explanation offered by Defendant for the temporary post order suggests (without directly stating) that the entry of the order was consistent with increased institution-wide security concerns "at that time." (Doc. 63-4 at ¶4). Defendant Erdos further attests that *all* inhabitants of J1 (not just those in the slammer cells) are considered to "have committed the most violent offense[s.]" (Doc. 63-4 at ¶6). Captain Whitman uses similar language to imply that the slammer cell occupants are the worst J1 offenders; Plaintiff testified that all three inmates housed in those cells had assaulted staff or been caught planning to do so.

Plaintiff testified that the slammer cells are both more secure and more isolated than other cells in J1. A reasonable jury could find that a post order requiring only the inmates housed in the most secure and isolated cells to be subjected to daily intrusive visual body-cavity searches was motivated by a subjective intention to punish the

selected inmates rather than by penological concerns. *See Parkell v. Danberg*, 833 F.3d 313, 327 (3rd Cir. 2016) (holding that Defendants were not entitled to summary judgment on Plaintiff's claim for prospective injunctive relief in the absence of a plausible theory as to how inmates in isolation cells, despite being more dangerous, would have thrice-daily opportunities to smuggle in contraband).[18]

Defendant's explanation for ordering Plaintiff to be strip searched a third time on the night shift also is suspect. Defendant Erdos professes to have been motivated by security concerns based upon Plaintiff's prior assaults, and the warden's belief that Plaintiff attacked Anderson in order to obtain a transfer to OSP. "Because I could not transfer him to OSP immediately, …I believed Plaintiff was particularly dangerous and could potentially assault another inmate or staff to obtain his goal" of transfer to OSP. (Doc. 63-4 at ¶9).[19] Of course, dangerousness alone says nothing about the Plaintiff's ability to obtain contraband. Aside from that, the explanation is at odds with the fact that the daily searches stopped abruptly after 30 days,[20] while Plaintiff remained in the same slammer cell for one or two months thereafter before being transferred to a regular cell in J1. Plaintiff was not transferred to OSP until nearly five months after his arrival at J1.

Defendant proffers the additional explanation that he ordered Plaintiff to be singled out for a third shift strip search because he "was particularly concerned about Plaintiff

---

[18]Defendant cites *Parkell* in support of his motion, because the Third Circuit upheld the grant of summary judgment to the defendants in their individual capacities on plaintiff's claim for monetary damages under both the Fourth and Eighth Amendments. However, the appellate court affirmed solely based upon the undisputed record that the named defendants "were not personally involved in creating the conditions." *Id.* at 323-324. There is no dispute that Warden Erdos was personally involved here. In context, *Parkell* supports Plaintiff's claims, because the court reversed the grant of summary judgment on a separate Fourth Amendment claim for injunctive relief to prevent further unreasonable searches.

[19]Defendant's Declaration speaks to being motivated by safety or security concerns but does not deny the existence of other motivations.

[20]Plaintiff's testimony connects the cessation of harassment with an ongoing investigation by the Ohio State Highway Patrol concerning the excessive force incident. (Doc. 78-1 at 76).

obtaining a weapon from a porter, at the end of second [shift], after the guards conduct their searches." (Doc. 63-4 at ¶¶10-11). The explanation resonates with the principle that in the absence of some opportunity to gain contraband, a policy requiring frequent invasive strip searches would not be rationally related to its stated objective. However, a genuine issue of material fact remains concerning the extent to which porters had access to the slammer cells in J1, as opposed to other areas of J1.[21] Plaintiff's complaint alleges that "[t]he only poss[i]ble contact that an inmate can have with another human while in a slammer cell is when the guard opens the cuff-port to slide his meals in." (Doc. 3 at ¶20). Plaintiff testified in deposition that access to the slammer cells is highly restricted, that the inmates are kept in isolation, and that only staff and not porters are permitted access to the slammer cells. (Doc. 78-1 at 77; see also id. at 62 (testimony that no porters can "get back there to you"). *See also Parkell*, 833 F.3d at 328 ("the probability is vanishingly small that an inmate locked in a stripped-down isolation cell…, once searched, could then obtain contraband during a subsequent eight-hour period involving no human contact.").

Plaintiff testified that when he questioned the basis for the searches and how long they were to continue, he received no explanation that suggested any penological motivation. Instead, one "white shirt" officer complained "you think I want to fucking do this shit?" and told Plaintiff that he asked the warden on a daily basis "when is this going to stop, you know, and he keeps telling me when he feels like it." (Doc. 78-1 at 66; *see also id.*, at 67 (Plaintiff's testimony that "the warden told me in his own words" that the strip searches would stop "when I feel like it.")).

---

[21]Defendant argues that Plaintiff appears to concede that porters have access to J-1 during second shift, (Doc. 73 at 1, citing Doc. 70 at 4). First, the undersigned does not agree that Plaintiff's response contains a clear admission that porters have access to the slammer cells. Second, in his sur-reply, Plaintiff attempts to clarify that porters are only allowed in the J-1 area during first shift.

Attached to Defendant's reply is a new Declaration to counter Plaintiff's testimony that it is virtually impossible for an inmate in a slammer cell to obtain contraband. Defendant states that during his multi-year tenure at SOCF, on an unspecified date,[22] contraband was found on an inmate located in a slammer cell. (Doc. 75-1 at ¶2). As Plaintiff points out, the Declaration appears to refer to a single incident and could refer to contraband not relevant to any legitimate security concern that would support the type of frequent visual body-cavity searches at issue here, as opposed to less frequent searches or less invasive ones. Contraband can include food retained to create fermented alcohol, and many other items beyond weapons or drugs. *See generally Florence*, 130 S. Ct. at 1519 (stating that contraband can include money, cigarettes, clothing or other everyday items).

The undersigned concludes that Defendant Erdos is not entitled to summary judgment. Construing all disputed factual issues in Plaintiff's favor, the undersigned finds that a reasonable jury could find that the warden directed his officers to conduct thrice-daily intrusive strip searches with the malevolent intention of punishing Plaintiff for assaulting a staff member, and not for any legitimate penological purpose.

On the other hand, the undersigned also finds no cause to award summary judgment to Plaintiff. When the same factual issues are construed in Defendant's favor, a reasonable jury could find that the post order requiring twice-daily strip searches of inmates deemed to be particularly dangerous was reasonably related to legitimate security interests, if the jury finds it was possible for the inmates in the slammer cells to

---

[22]There is no suggestion that the incident occurred close in time to the imposition of the referenced post order or to the searches at issue, nor any details concerning the source of the contraband or precisely where it was located on the inmate.

obtain weapons or other contraband, and that less intrusive searches than the multiple daily body-cavity searches that were carried out would not be sufficient to ensure security. For the same reasons, a jury could conclude that it was reasonable to single Plaintiff out for a third nightly search.

### B. The Eighth Amendment Claim

To prove his claim under the Eighth Amendment, Plaintiff must show that the strip searches amounted to a type of cruel and unusual punishment.  Although the Fourth Amendment is violated if a plaintiff shows that the search is objectively unreasonable (regardless of whether he also proves ill intent), the Eighth Amendment is violated *only* if Plaintiff can demonstrate that the warden acted "with a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991).

> The Fourth and Eighth Amendments have different roles to play with respect to bodily searches and protect different categories of constitutional rights. The Eighth Amendment safeguards prisoners against the use of searches that correctional officers subjectively intend as a form of punishment.

*Henry v. Hulett*, 969 F.3d 769, 781 (7th Cir. 2020) (en banc) (internal citation omitted).

Defendant argues that Plaintiff is not entitled to summary judgment because "Plaintiff has proffered no evidence that conclusively shows Warden Erdos acted maliciously." (Doc. 61 at 13).  The undersigned agrees, construing the record in Defendant's favor, that factual disputes remain as to whether Defendant Erdos acted maliciously and sadistically in directing that Plaintiff be subjected to thrice-daily searches. However, the undersigned does not agree that Defendant is entitled to summary judgment.  Viewing the record as a whole, a reasonable jury could conclude that Defendant Erdos did act with the requisite intent.

### C. Qualified Immunity

Defendant Erdos argues that he is entitled to qualified immunity under *Sumpter v. Wayne County*, 868 F.3d 473, but that case is easily distinguished. *Sumpter* granted qualified immunity on a Fourth Amendment claim to a defendant who offered an <u>uncontested</u> legitimate penological justification (health and safety concerns) for periodically conducting group strip searches when the number of jail inmates waiting to be processed made individual searches imprudent. Another distinguishing fact was plaintiff's testimony that the defendant did not intend to humiliate or harass her. *Id.*, 868 F.3d at 483. The court held that the law was not clearly established that a search conducted under such circumstances would violate the Fourth Amendment. In so holding, the court distinguished *Stoudemire* and *Williams*, in part because both were decided after the searches at issue in *Sumpter*, and in part because the existence of any valid penological interest was disputed in those cases.

The facts presented in this case align with those in *Stoudemire* and not *Sumpter*. In *Stoudemire*, the court denied qualified immunity because at the time of the 2007 search, "it was clearly established that suspicionless strip searches were permissible as a matter of constitutional law, but only so long as they were reasonable under the circumstances and performed pursuant to a legitimate penological justification." *Id.*, 705 F.3d at 575. On the record presented and viewing the evidence in the light most favorable to Plaintiff, Defendant should have known that conducting thrice-daily strip searches devoid of any legitimate penological justification was constitutionally unreasonable.

Defendant's qualified immunity arguments focus primarily (if not exclusively) on whether Plaintiff's asserted constitutional right was clearly established under the Fourth

Amendment.   Assuming that Defendant intended to more clearly assert the same argument under the Eighth Amendment, the undersigned rejects it.   At the time of the strip searches at issue, it was clearly established that force applied  "maliciously and sadistically to cause harm" violates the Eighth Amendment. *See Wilkins*, 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7).  Still, the law concerning <u>recovery</u> for Plaintiff's alleged injury under the Eighth Amendment is less well-established.   Notwithstanding the Defendant's failure to raise this issue, the undersigned will address it as relevant to the assertion of qualified immunity.

Two unpublished Sixth Circuit cases hold that "absent [physical] injury related to the strip search, [an inmate's] Eighth Amendment claim is not cognizable" under a provision of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e)." *See Jackson v. Herrington*, 393 Fed. Appx. 348 (6th Cir. 2010) (per curiam); *Adams v. Rockafellow,* 66 Fed. Appx. 584, 586 (6th Cir.2003).  The undersigned finds *Jackson* and *Adams* to be unpersuasive in light of more recent published case law in the Sixth Circuit holding that §1997e(e) "does not bar claims for constitutional injury that do not also involve physical injury." *King v. Zamiara*, 788 F.3d 207, 213 (6th Cir. 2015) (First Amendment claim).

The Supreme Court also has rejected the notion that some "arbitrary quantity" of physical injury is required to state an Eighth Amendment claim.

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Hudson,* 503 U.S. at 9; *see also id.*, 503 U.S. at 16 (Blackmun, J., concurring) ("It is not hard to imagine inflictions of psychological harm – without corresponding physical harm – that might prove to be cruel and unusual punishment.").

Plaintiff's complaint seeks both compensatory and punitive damages. (Doc. 3 at 11). Even if a reviewing court were to conclude that the law concerning Plaintiff's claim for compensatory damages under the Eighth Amendment is not clearly established, Plaintiff's claim for punitive damages is still cognizable. *Small v. Brock*, 963 F.3d 539 (6th Cir. 2020) (recognizing claims for punitive damages, injunctive and declaratory relief under the Eighth Amendment without physical injury and "strong argument" for recovery of compensatory damages for the alleged constitutional injury); *but see Harden-Bey v. Rutter*, 524 F.3d 789, 795-96 (6th Cir. 2008) (affirming dismissal of Eighth Amendment claim, reasoning that even if the complaint were read to allege emotional injuries, it failed to state a claim in the absence of a physical injury under the PLRA).

### III. Conclusion and Recommendation

For the reasons discussed, **IT IS RECOMMENDED THAT:**

1. Plaintiff's motion for summary judgment (Doc. 54) should be **DENIED**;

2. The motion of Defendants Eshem, Felts, Fri and McCoy (Doc. 63) should be **GRANTED in part** and **DENIED in part.** Consistent with this R&R, judgment should be granted in favor of Defendants Fri and McCoy on all claims. In addition, judgment should be granted to Defendants on any claim of excessive force prior to Plaintiff's entry into the infirmary. However, summary judgment should be denied on Plaintiff's Eighth Amendment claims against Defendants Felts and Eshem for the force allegedly used against Plaintiff in the infirmary.

3. The motion of Defendant Erdos for summary judgment (Doc. 61) should be **DENIED**;

4. If this R&R is adopted, the court should entertain a renewed motion seeking the appointment of counsel for Plaintiff for purposes of proceeding to trial.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KARL FUGATE,                                    Case No. 1:19-cv-30

       Plaintiff,                           McFarland, J.
                                                Bowman, M.J.
   v.

RONALD ERDOS, et al.,

       Defendants.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN  (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).